## Case No. 6,300.

HEARN v. EQUITABLE SAFETY INS. CO.

[4 Cliff. 192.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1872. [2]

COURTS OF EQUITY — POWER TO REFORM POLICY OF INSURANCE — SETTLED FORM OF CHARTER — UNDERWRITERS — REPRESENTATIONS — WARRANTIES.

1. Courts of equity possess the power to correct mistakes in policies of insurance, even to the extent of changing the most material clauses; but the power should be exercised with great caution, and only when the proof is entirely satisfactory.

2. Where an instrument is intended to carry into effect an agreement, whether in writing or by parol, but by mistake of the draftsman, either of law or fact, does not fulfil, or violates,

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]
[2] [Affirmed in 20 Wall. (87 U. S.) 494.]

the manifest intention of the parties, equity will correct the mistake so as to produce conformity of the instrument to the agreement.

3. When there is a settled form of charter in a particular trade, underwriters are bound to know the customary stipulations of a charter in that trade, and when informed by an applicant that the vessel is chartered in such trade, the contract of insurance must be considered to be made with the understanding that the charter is framed in the usual way, unless the correspondence leads to a different conclusion.

4. In their letter of acceptance of the proposed insurance, the underwriters said that it was worth something to cover the risk at the port of loading. Held, this implied that it was not to be the same as the port of discharge, and knowing that the outward cargo was coal, the underwriters were bound to know that charters for such voyages usually contained a stipulation allowing a second port for loading the return cargo.

5. Equity will reform a policy not containing such a permission when, as in this case, the antecedent correspondence of the parties showed that the complainant intended to secure such protection, and that the respondent knew such to be his understanding.

6. When the contract is agreed to, whatever it, by fair interpretation, includes, the underwriters are bound to insert in the policy, and if they omit to do so, the insured has a right to insist upon strict conformity to the original agreement.

7. A misrepresentation in insurance is a false representation of a material fact by one of the parties to the other, tending directly to induce such other to enter into the contract, or to do so on less favorable terms to himself, when without the misrepresentation such other party might not have entered into the contract at all, or done so on different terms.

8. Applicant's letters to the underwriters stated that the vessel would take, on her outward voyage, her register tonnage of coal, but she did carry more than that quantity. Held, not a material misrepresentation. 1. Because the letters, when properly construed, did not amount to a representation that the cargo did not exceed that amount. 2. Because the representation was not material to the risk, she was not overloaded, nor was the voyage prolonged or risk increased thereby. 3. Because the representation had no effect in determining the underwriters whether to insure or not.

9. Representations are collateral and incidental to the contract of insurance; warranties are stipulations forming part of it, and are construed as conditions.

10. Extraneous statements, not introduced into the policy, are regarded as collateral to the contract, unless expressly referred to in the same. If so referred to, they acquire the character of warranties.

11. When a provision was made in a policy to indemnify the respondents, if the cargo of coal exceeded the registered tonnage, and where it was clear that the insurers did not regard the applicant's statement, as to quantity, as founded on positive knowledge. Held, that the stipulation, "outward cargo of coal not to exceed registered tonnage," was not a material misrepresentation.

12. Policy reformed to agree with the correspondence of the parties.

[See note at end of case.]

Bill in equity to reform a policy of insurance. An action of assumpsit was first brought on the policy, and the case was heard and decided by Clifford, J. (Oct. Term, 1870 [Case No. 6,299]).

Insurance on charter of barque Maria Henry was granted by the respondents on the 11th of May, 1866, in the sum of $4,000, "at and from Liverpool to a port of discharge in Cuba, and at and thence to port of advice and destination in Europe." When the application for the policy was made, the barque was at Liverpool, and it appears that she loaded at that port with a cargo of coal, and having been regularly cleared there, she proceeded thence, without difficulty, on her outward voyage to the port of St. Jago de Cuba, where she discharged her outward cargo, and, having accomplished that object, she sailed thence to Mansanilla, another port in Cuba, and there took on board a cargo of the products of the island; and on the 13th of September sailed thence for Europe, via Falmouth for orders, and on the 18th of the same month was totally lost, by perils of the sea, on her return voyage. Due notice of the loss which was admitted, was given to the respondents; but they refused to pay the amount insured, or any part of the same, upon the ground that the barque, without any justifying cause, departed from the prescribed course of the voyage as described in the policy mentioned in the bill of complaint. The refusal to pay was based solely upon the ground that the barque, after she discharged her outward cargo, went to a second port for a return cargo, and this court, in the suit at law founded upon the policy, was of the opinion that the plaintiff [George Hearn] could not recover, as the going to a second port to load was not authorized by the terms of the contract, and amounted to a deviation that, tested by the words of the policy, was certainly a departure from the regular and usual course of the voyage therein specified, and inasmuch as it was voluntary and without actual necessity, or any cause recognized by the law of insurance as reasonable, it must at law be regarded as a departure, and as an answer to any legal claim made by the plaintiff. The complainant was a part-owner and agent of the barque, and he alleged that the master of the barque, on the 5th of April, 1866, chartered her to one John Meek for a round voyage from the port of Liverpool to the island of Cuba, and thence to return to a market port in Europe for orders where to discharge; that a charter party to that effect was signed by the master, in which it was agreed that the barque should, in the course of the voyage, visit two ports in the island of Cuba; that being informed that the barque was so chartered, and that she would carry a cargo of coal on her outward voyage from Liverpool, he made application, by a letter bearing date May 2, 1866, to the corporation respondents, to insure the sum of $4,000 on the charter of the barque, valued at $16,000, provided the premium to be charged therefor by the company should not exceed three per cent., the voyage for which the charter was granted being described in the letter in the words following, to wit: "Voyage from Liverpool to Cuba and to Europe, via Falmouth for orders where to discharge," adding, "She will take her register tonnage of coal to Cuba." By that letter the respondents were requested to insure on the charter of the barque, and were informed that the voyage was from Liverpool to Cuba, and to Europe via Falmouth for orders where to discharge and that she would take her register tonnage of coal to Cuba. The reply of the respondents, dated May 4, 1866, showed that they fully understood the nature of the application, as they said in their reply, "We cannot write the charter of barque Maria Henry at your rate, viz., three per cent., including coals from Liverpool to Cuba. Our rate will be four per cent. for the voyage, to include coals." On the 7th of the same month the plaintiff replied, repeating the statement that the barque would take her register tonnage of coal to Cuba, and insisting that the respondents, if they took the whole matter into consideration, ought to take the risk at three per cent., or at four per cent., and one and a half per cent. to be returned if no loss. Evidently the respondents reconsidered the matter, as they responded as follows, on the succeeding day: "We will write upon the charter of the barque as proposed by you, Europe to Cuba, and back to Europe, at three and a half per cent. net. It is worth something, you know, to cover risk at port of loading in Cuba," and concluded by saying, "We cannot take the risk at any lower figure." Distinct notice was given to the respondents, in the first letter of the plaintiff, that the subject of insurance was the charter of the barque, that the voyage was from Liverpool to Cuba, and to Europe, via Falmouth for orders where to discharge, and that the barque would take her register tonnage of coal to Cuba. Much stress was laid by the respondents upon the fact that the outward cargo was to be coal; because they said in their reply to the first letter of the plaintiff, "We cannot write the charter at three per cent., including coals from Liverpool to Cuba," adding, in conclusion, "Our rate will be four per cent. for the voyage, to include coals;" showing conclusively that, in their view, the rate ought to be higher because the vessel was to carry her register tonnage of coals. Evidence was introduced by the plaintiff, showing that charters for such a voyage almost invariably contain a stipulation, authorizing the vessel to go to a second port to load, and some of the witnesses, of great experience, testified that they never knew a charter in that trade which did not contain such a stipulation. Such a provision was in this charter, and the correspondence afforded clear evidence that both parties intended that the contract should embrace that risk as a part of the voyage.

Walter Curtis and B. R. Curtis, for complainant.

John C. Dodge, for respondents.

Before CLIFFORD, Circuit Justice, and LOWELL, District Judge.

CLIFFORD, Circuit Justice. Courts of equity unquestionably possess the power to correct mistakes in policies of insurance, even to the extent of changing the most material clauses therein which are the subjects of special agreement; but the settled practice is that the power should be exercised with great caution, and only in cases where the proof is entirely satisfactory. Oliver v. Mutual Commercial Marine Ins. Co. [Case No. 10,498]. Where an instrument is drawn and executed, which professes or is intended to carry into execution an agreement, whether in writing or by parol, previously entered into, but which by mistake of the draftsman, either of fact or law, does not fulfil, or violates, the manifest intention of the parties to the agreement, equity will correct the mistake, so as to produce a conformity of the instrument to the agreement. Hunt v. Rousmanier, 1 Pet. [26 U. S.] 12. Underwriters are in general bound to know the course of the trade which they insure, and cannot resist a claim for loss, otherwise valid, upon the ground that they were ignorant of it, unless a contrary intention is expressed in the policy, or is to be implied from the language employed. Vallance v. Dewar, 1 Camp. 508; Noble v. Kennoway, 2 Doug. 513; 1 Duer, Ins. 196, 197.

Deviation is the defence in this case, as the evidence to establish the defence is that the barque, after she went to St. Jago de Cuba, and there discharged her outward cargo, proceeded thence to Mansanilla for her return cargo, before she sailed for Europe. Attempt was made by the plaintiff in the suit at law, to show that the usage of the trade justified the owners of the insured vessel in sending her to a second port for a return cargo, and that such an act did not constitute a deviation within the meaning of that term in the law of insurance. Nothing of the kind is expressed in the policy, and the court was unable to adopt the views of the plaintiff, for two reasons: 1. Because the testimony introduced did not prove the alleged usage. It showed that charters in that trade almost invariably contained authority to go to a second port to load; but it did not show that as between the insurer and the insured, the vessel possessed any such authority, unless it was expressed in the policy, or to be implied from the language employed. 2. Because the court was of the opinion that evidence of such a usage, even if proved, was not admissible to vary or enlarge the meaning of the language of the policy, as the language employed is clear and unambiguous. Called upon, as the court then was, to construe the language of the policy, the court was bound to give it its usual and ordinary signification; but the question presented in the present case is quite different, as it involves the construction of the correspondence which preceded the execution of the policy. Application was made for a policy upon the charter of the barque, and the underwriters were plainly notified what the voyage would be, and that the outward cargo would be coal. They must have known that the owner expected to discharge the outward cargo at the port of destination, and to have leave to visit a second port for a return cargo, as the evidence shows that such policies almost invariably contain a stipulation granting that privilege. Pursuant to that understanding, the complainant closed the correspondence in the following terms: "I accept your proposition in reference to the insurance of the charter of the barque. Please insure $4,000, at 3½ per cent., on the charter, valued at $16,000, at and from Liverpool to Cuba, and to Europe via a market port for orders where to discharge." Weighed in view of the circumstances, the court is of the opinion that the correspondence shows a concluded agreement, insuring the charter of the barque for the voyage mentioned in the charter party as described in the first letter of the complainant, during the passage of the vessel from Liverpool to the island of Cuba, and during her discharge and loading at the island, and from that island to her port of discharge in Europe. Unquestionably both parties contemplated that the barque would discharge her outward cargo, and take on board her return cargo, before she sailed for her ultimate destination; and in view of the correspondence and the attending circumstances, not a doubt is entertained by the court that both understood that the vessel might, if necessary, go to a second port for her return cargo. Where there is a settled form of charter in a particular trade, underwriters are bound to know the customary stipulations contained in a charter in that trade, and when informed by an applicant for a policy of insurance, that the vessel described in the application is chartered in that trade, it must be understood that the contract of insurance is made with the understanding that the charter is framed in the usual form, unless the correspondence tends to a different conclusion. Salvador v. Hopkins, 3 Burrows, 1707; Gregory v. Christie, 3 Doug. 419; Grant v. Paxton, 1 Taunt. 468; 1 Marsh. Ins. 184.

Protection at the port of loading was clearly within the contract, as the underwriters remind the plaintiff, in their second letter, that it is worth something to cover the risk at port of loading, which clearly implies that it may not be the port where the outward cargo should be discharged, as they knew that the outward cargo was coal, and were bound to know that charters for such a voyage usually contained a stipulation allowing a second port for loading the return cargo. Undoubtedly underwriters may refuse to grant that privilege, or the insured may voluntarily accept a policy which denies it, or does not contain it; but the correspondence

in this case satisfies the court that the respondents did not so refuse, and that the complainant intended to secure it, as the clear inference from the letters of both parties is, that the complainant expected that protection, and that the respondents knew that such was his understanding of the agreed terms for the policy. That equity will reform such a contract, where there is a mistake of such a character, whether it be termed a mistake of law or of fact, is beyond all doubt, as appears by numerous authorities in addition to those to which reference has already been made. Henkle v. Royal Exchange Assur. Co., 1 Ves. Sr. 317; Motteux v. London Assur. Co., 1 Atk. 545; Collett v. Morrison, 12 Eng. Law & Eq. 171; Andrews v. Essex Co. [Case No. 374].

When once the contract is agreed to, whatever that contract, by a just and reasonable interpretation, includes, the underwriters are bound to insert in the policy, and if they omit to do it, the insured has a right to insist upon a perfect conformity to the original proposition and agreement. Canedy v. Marcy, 13 Gray, 377; Gillespie v. Moon, 2 Johns. Ch. 596; Wake v. Harrop, 1 Hurl. & C. 202; Finlay v. Lynn, 6 Cranch [10 U. S.] 238.

Suppose that is so, still it is contended by the respondents that the complainant is not entitled to a decree, because they insist that the letters of the plaintiff contain a material misrepresentation. Reference is there made to the fact that the letters state that the vessel would take, as outward cargo, her register tonnage of coal, and to the conceded fact that she carried more than that quantity. Tested by that consideration, the respondents contend that the bill of complaint must be dismissed, even if the court is of the opinion that the contract of insurance, as made by the parties, is not correctly set out in the policy; but the court is of a different opinion, for several reasons: 1. Because the letters, when properly construed, do not amount to a representation that the cargo did not exceed the registered tonnage of the vessel. 2. Because the representation was not, in fact, material to the risk, as there is no pretence that she was overloaded, or that the excess had any effect to prolong the passage, or to increase the risk. 3. Because the representation did not have any effect to determine the underwriters to insure, or to regulate their estimate of the premium. A misrepresentation in insurance is a false representation of a material fact by one of the parties to the other, tending directly to induce the other to enter into the contract, or to do so on less favorable terms to himself, when otherwise he might not enter into the contract at all, or might demand terms more favorable. 1 Phil. Ins. § 529. No fact is to be deemed material unless there is just reason to believe that it either determined the underwriter to insure, or regulated his estimate of the premium. 2 Duer, Ins. 680. Representations differ materially from warranties in the law of insurance, as the former are regarded as collateral statements of facts incidental to the contract; but a warranty is a stipulation forming a part of the contract, and is construed as a condition. All statements in the policy itself are prima facie warranties, but extraneous statements are, in general, regarded as representations even when made formally in writing, or in answer to written or printed questions propounded by the insurers. Such statements, when not introduced into the policy, are ordinarily regarded as collateral to the contract, unless when expressly referred to in the policy as forming a part of the contract, when they acquire the character of warranties, and invalidate the insurance, unless strictly complied with, whether they are or are not material to the risk assumed by the insurer. Eddy Street Iron Foundry v. Hampden Stock & Mut. Fire Ins. Co. [Case No. 4,277].

Representations may be material and of a character, if not true, to avoid the contract; but there can be no pretence, in this case, that the respondents were induced to execute this policy by the fact that the barque would carry only her registered tonnage, or that they would not have entered into the contract of insurance at all had they known that she would carry the cargo which she did carry and discharge in safety. Enough appears in their printed form of policies to negative every such inference, as the following clause is found in the margin of the policy: "To add for each passage, viz., one per cent. if loaded with more than registered tonnage of guano, coal, salt, nitrate of soda, iron, copper ore or slate, either, or in any combination." Provision is therefore made to indemnify the respondents in case the cargo of coal exceeds the registered tonnage. Responsive to that, it is insisted by the respondents that the representation was false; but the evidence does not support any such conclusion, and the letter of the respondents tends strongly to negative it and to show that the representation was treated by them as an immaterial and unascertained matter, as the respondents do not allude to the registered tonnage as a limit to the outward cargo. Doubtless they knew that the plaintiff could not control the matter, and that the master took no account of the quantity, as the coal out, under such a charter, earned no freight. Influenced by these considerations, the better opinion is that the respondents did not regard the statement as to quantity, as one founded upon positive knowledge, and consequently inserted the provision for one per cent. additional in case the coal carried exceeded the registered tonnage. Executed, as the policy was, in the usual and ordinary form of policies issued by this company, the court is of the opinion that the representation was not material, in their mode of conducting the business of insurance in that trade. Flinn v. Headlam, 9 Barn. & C. 693;

2 Duer, 682. In view of all the circumstances, the court is of the opinion that the policy must be reformed, as prayed in the bill of complaint, and that the complainant is entitled to a decree to that effect, and for his costs.

[NOTE. An appeal was then taken by the insurance company to the supreme court, where the decree was affirmed in an opinion by Mr. Justice Swayne, who said that "the clear terms of the preliminary agreement warranted the court below in overruling the departure from it found in the policy." 20 Wall. (87 U. S.) 494. See, also, Id. 488, and Cases Nos. 6,299, 6,301, and 6,302.]